# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

LOUAY M. AWADH

Plaintiff

CIVIL ACTION

V.                                                              NO. _____

TOURNEAU, INC.

Defendant

November 30, 2015

**COMPLAINT**

## A. PARTIES

1.     The Plaintiff Louay M. Awadh ("Plaintiff" or "Mr. Awadh")

PO. Box 230046, Boston, MA. 02123-0046        Tel: (617) 499-6913

2.     The Defendant Tourneau, Inc. ("Defendant" or "Tourneau" or "Employer") is operating a Fine Jewelry business in Boston, Suffolk County, Massachusetts and conducting business in 13 states with a 33 store locations in the United States.

Business Address:   100 Huntington Avenue, D-13, Boston, MA. 02116-6505        Tel: (617) 267-8463

Headquarter Address: 663 5th Ave Floor 7, New York, NY. 10022-5303              Tel: (212) 758-3265

Counsel for Tourneau, Inc.

Attorney Matthew D. Freeman, Esq.

Jackson Lewis, LLP

75 Park Plaza, Boston, MA. 02116-3925

1

## B. NATURE OF THE CLAIMS

3.      This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendant's unlawful employment practices and retaliation against Plaintiff, including Defendant's unlawful discrimination, harassment and retaliation against Plaintiff because of his race/color, national origin and/or disabilities, and because of his repeated complaints about such unlawful discrimination, harassment and retaliation, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101 et seq. ("ADA"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 through 29 U.S.C. § 634 ("ADEA"), the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. sec. 2601; 29 CFR 825.

4.      Over the course of Plaintiff's nearly eight months employment history at Tourneau, Defendant Repeatedly subjected Plaintiff to unlawful discrimination and harassment because of his race/color, national origin and disabilities, sexual harassment, as well as to unlawful retaliation. The blatantly hostile work environment at Tourneau includes the frequent use by Plaintiff's co-workers and direct supervisors of derogatory comments and/or remarks, such as referring to Plaintiff as "You are too old", "Don't chop my head not in this country", "Drop your pants", "This is America and sometimes you have to loosen up and break the rules"[1], "Don't be strict about Friday", "It's just one day and no harm will be done", "I am sure you would be forgiven" and acts of intimidation, such forcing Plaintiff to work scheduled day off such Friday and threats of termination "Are we on the same page" and "The economy is bad and more applicants are looking for jobs". Plaintiff has complained about this and other discriminatory and harassing misconduct at Tourneau.

5.      Defendant's conduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for the Plaintiff, which has caused the Plaintiff to suffer substantial economic and non-economic damages, permanent harm to his professional and personal reputation, and severe anguish and emotional distress.

## C. JURISDICTION

6.      This action is brought pursuant to Title VII of the Civil Rights Act of 1964 as amended, for Employment discrimination. Jurisdiction is specifically conferred on this Court by 42 U.S.C. §2000e (5). Equitable and other relief are also sought under 42 U.S.C. § 2000e (5)(g). Jurisdiction is also based on 28

---

[1] Mr. Tiwary was referring to my Islamic belief/practice.

U.S.C. §§ 1331, 1332, 1343 and 42 U.S.C. §§ 1981 et seq. Where employment discrimination based upon age is alleged, jurisdiction is conferred by 29 U.S.C. §§ 626(c)(1) and appropriate relief is also sought. Family and Medical Leave Act of 1993 (FMLA) 29 U.S.C. sec. 2601; 29 CFR 825)

## D. PROCEDURAL REQUIREMENTS

7.   Plaintiff has complied with all statutory prerequisites to filing this action.

8.   On August 2, 2010, Plaintiff filed a Verified Complaint (the "August 2, 2010 Complaint") with the Commonwealth of Massachusetts Commission Against Discrimination (the "MCAD") charging Defendant with unlawful discriminatory employment practices because of disability, national origin, and race/color.

9.   On November 5, 2010, Plaintiff also amended (the "November 5, 2010 Amendment") his existing claim to include more allegations.

10.   On November 8, 2010, the MCAD called for mediation and both parties accepted. On December 14, 2010, the case was settled under the MCAD's mediation. The mediator disclosed Massachusetts' Provision[2] of the one week period to revoke such agreement for employees who are above the age of 40. On December 19, 2010, Plaintiff revoked his signature. As a result, the case went back for investigation.

11.   On August 7, 2014, the MCAD dismissed the case based on Lack of Probable Cause (LOPC) and issued the right to appeal. On January 15, 2015, Plaintiff appealed the MCAD findings. On March 27, 2015, the MCAD determined his case as LOPC.

12.   On September 1, 2015, dated letter, the Equal Employment Opportunity Commission ("EEOC") adopted the MCAD's findings and issued Dismissal and the right to sue (Exhibit A is Attached) to bring suit in Federal District Court based on the allegations of unlawful discrimination on the basis of Race/Color, National Origin and Age Discrimination, Sexual Harassment, Sex Discrimination and Disability set forth in the August 2, 2010 Complaint and November 5, 2010 Amendment.

13.   This action has been filed within 90 days of Plaintiff's receipt of his right-to-sue letters from the EEOC. Hence, The Plaintiff received the letter on September 3, 2015, for the record.

14.   Any and all other prerequisites to the filing of this suit have been met.

## E. FACTS

15.   Plaintiff is a Middleastern Muslim immigrant to the United States.

---

[2] In 1990, Congress amended the ADEA by adding the Older Workers Benefit Protection Act (OWBPA) to clarify the prohibitions against discrimination on the basis of age.

16.    He obtained his education from Northeastern University and graduated with a Bachelor of Science in Civil Engineering.

17.    Plaintiff is a hard-working 52-year-old Middleastern Muslim immigrant who have worked as a Cashier, Supervisor, Assistant Manager and Engineer for nearly 28 years, regularly working five to six days a week to support his parents and himself.  He is a conscientious and reliable employee who at all times perform his duties and tasks in an exemplary manner.  Plaintiff gained experience on the management level with a strong background in retail operations, merchandising, sales, human resources and excellent customer service.  He has expertise in supervising personnel, hiring, training, scheduling, submitting payroll, loss prevention and inventory control.

18.    Plaintiff joined Alpha Omega and worked for them from June 6, 2000 – May 23, 2008.  Alpha Omega was in the business providing variety of high-end watches "Jewelry watches" and low-end brands.  Thus, Plaintiff has eight years of experience in the watch industry prior working for the Defendant Tourneau, Inc.

19.    The Defendant Mr. Vineet Tiwary joined Alpha Omega in 2003 and left in 2007.  Mr. Tiwary joined Tourneau in 2007.

**F. APPLYING FOR A JOB WITH TOURNEAU, INC.**

20.    Prior joining Tourneau, Inc. Plaintiff worked for Alpha Omega and Linen's –N- Things.  Both employers went out of business in the same year of 2008.  Also, the fall of the market in the year of 2008 and 2009 effected the global economic.  As a result, "the hemorrhaging of American jobs accelerated at a record pace at the end of 2008, bringing the year's total losses to 2.6 million or the highest level in more than six decades."[3]

21.    On January 16, 2009, Plaintiff applied for management position on his job application and was interviewed by, Mr. Tiwary, the General Manager of the Defendant's Huntington Avenue, Boston, Massachusetts location.  During the interview, Plaintiff inquired for management and Sales which were suitable to his extensive experience in management, sales and customer service.  Mr. Tiwary informed him that there were two vacant positions; a full-time Vintage Manager position, which was an Assistant Manager position, and a full-time Cash Office Associate position.  However, Mr. Tiwary would inform the Plaintiff if there was a vacant Sales Associate if one became available in the future.

22.    Though, there was no vacant position for Sales Associate, the Plaintiff showed his interest.

---

[3] By David Goldman, CNNMoney.com.  January 9, 2009.

4

**G. PLAINTIFF'S OBLIGATORY PRAYER, PRACTICES AND OBSERVANCES**

23.    Plaintiff brought up the issue about Friday during his interview with Mr. Tiwary. Mr. Tiwary was aware of the fact that if the Plaintiff was hired, he would need Fridays off. Mr. Tiwary evidently understood the Plaintiff's religious beliefs, practices and observances. It was not a new issue for Mr. Tiwary since they worked for Alpha Omega. Indeed, the Plaintiff didn't wok Fridays throughout his employment at Alpha Omega. In addition, Mr. Tiwary was his immediate manager at Alpha Omega and actually never schedule him for Fridays. As a General Manager for Tourneau, Mr. Tiwary agreed to accommodate the Plaintiff's religious practice by giving him Fridays off. It was clear that Mr. Tiwary assured the Plaintiff` that Fridays would not be a problem. Out of Courtesy, the Plaintiff had offered to work any day or night schedule, double shifts and every weekend.

24.    Two weeks later from January 16, 2009, Mr. Tiwary informed the Plaintiff that someone else was hired for the management position. Then, the Plaintiff inquired for the Sales Associates position and if it was currently open. Mr. Tiwary replied the position was not open, but he inform the Plaintiff that the full-time Cash Office Associate position was currently open. The Plaintiff took hold of Cash Office position and hoped a Sales Associate position would be available the near future.

25.    On February 1, 2009, the Plaintiff was hired by Defendant Tourneau to work in the cash office. His job title was Cash Office Associates.

**H. RELIGIOUS DISCRIMINATION**

26.    Mr. Tiwary, surprisingly, scheduled the Plaintiff for some Fridays. The Plaintiff, unwillingly, was made to work these Fridays. As a result, he was forced to violate his own religious practices for fear of termination or negative consequences from his Employer.

27.    On February 13, 2009, the Plaintiff was scheduled to work from 3:00pm – 9:30pm on a Friday and went into work. He was forced to come at 1:00pm instead of 3:00pm and went to work two hours early. The Plaintiff was forced to violate his own religious practices.

28.    On March 6, 2009, the Plaintiff was not scheduled to work on a Friday. But, he was forced to come and work from 8:00am – 12:00pm.

29.    On March 13, 2009, the Plaintiff was scheduled to work from 8:30am – 11:30am on a Friday and went into work.

30.    On April 10, 2009, the Plaintiff was not scheduled to work on a Friday. He was forced to come and work from 12:30pm – 8:30pm. The Plaintiff went to work in his day off. He was forced to violate his own religious practices.

31.     On April 23, 2009, on Thursday, Plaintiff was scheduled to work from 1:00pm – 9:30pm, but he called out sick. Plaintiff was told that he must work the following day April 24, 2009, on a Friday.

32.     On April 24, 2009, the Plaintiff was not scheduled to work on a Friday. He was forced to come and work from 3:30pm – 8:30pm. The Plaintiff went to work in his day off. He was forced to violate his own religious practices.

33.     On May 8, 2009, the Plaintiff was scheduled to work from 9:30am – 11:30am on a Friday and went into work. He was forced to come at 9:00am instead of 9:30am. He went to work half hour early. The Plaintiff got off late from work at 2:22pm because Ms. Lillian Casillas, Cash Office Manager, was late two hours and fourty five minutes. The Plaintiff was forced to violate his own religious practices.

34.     On May 19, 2009, the Plaintiff formally reminded Mr. Tiwary in writing regarding the issue of Fridays when he knew he was scheduled to work on Friday, May 22, 2009. The Plaintiff also included in his letter requests for some days off.

35.     On May 22, 2009, the Plaintiff was scheduled to work from 8:30am – 11:00am on a Friday and went into work.

36.     On June 19. 2009, Mr. Tiwary informed the Plaintiff that he could no longer have Fridays off.

37.     On May 19, 2009, the Plaintiff made a request to have August 22, 2009, off. Mr. Tiwary scheduled him on that date. Though, the Plaintiff reminded him two weeks earlier before he scheduled him. The Plaintiff went into work. Mr. Tiwary's letter date on June 8, 2009, that he would not schedule the Plaintiff on that day.[4]

38.     On May 19, 2009, the Plaintiff made a request to have September 17, 2009, off. Mr. Tiwary scheduled him on that date. Though, the Plaintiff reminded him two weeks earlier before he scheduled him. The Plaintiff went into work. Mr. Tiwary's letter date on June 8, 2009, that he would not schedule the Plaintiff on that day.[5]

39. The Plaintiff alleges in his charge of discrimination that he was discriminated against because of his religion. The employer required the Plaintiff to violate a religious which is required by his religion; and gave the employer notice of such religious

---

[44] Mr. Tiwary's letter was dated on June 8, 2009, and was handed on June 19, 2009.

[5] Mr. Tiwary's letter was dated on June 8, 2009, and was handed on June 19, 2009.

**I. AGE DISCRIMINATION**

40.   My immediate supervisor, Cash Office Manager, Ms. Lillian Casillas sometimes made comments that the Plaintiff was too old when she explained something about the cash office and he would not understand her when she spoke fast and what she meant.

**J. SEX "GENDER" DISCRIMINATION AND DENYING PROMOTION**

41.   The Plaintiff was 46 years old Non-Caucasian. All Sales Associates specifically who sell watches on the sales floor are in their twenties and thirties and are Caucasian or are light-skin in appearance. There is virtually no individual with ethnic features that can be discerned as easily as with an African American.

42.   My weekly pay was $400 per week and the Plaintiff would be making $20,800 per year. However, Sales Associates make at least $47,000 per year and at most $105,000 per year in commissions and bonuses.  No only the Plaintiff would make a substantial monetary income, but also he would have contributed to the company success and utilized his experience in management, customer service and sales to make a better living for himself and his family.

43.   On or about the third week of February 2009, Mr. Tiwary interviewed young Caucasian female applicants.

44.   On February 22, 2009, Mr. Tiwary hired Ms. Laura Marotta as full-time Sales Associate on the sales floor.  She was a trainee and mentored by seniors Sales Associate.

45.   The Plaintiff was surprised and disappointed.  Mr. Tiwary denied him the opportunity for that position.

46.   On or about March 8, 2009, Ms. Marotta was promoted and transferred to Burlington Mall location and held a position as a Cash Office Manager.

47.   The Plaintiff inquired Ms. Marotta's vacant position.  Mr. Tiwary denied him the vacant position.

48.   On or about June 27, 2009, two Sales Associates; namely Ms. Jodi Bienstock and Ms. Diane Toomey were laid off.  The Plaintiff inquired for the Sales Associate position.  Mr. Tiwary denied him.

49.   On or about September 13, 2009, Mr. Brian Patten, Sales Associate, was terminated.

50.   On the third week of September 2009, Mr. Tiwary started to interview young Caucasian female applicants.

51.   On or about September 21, 2009, the Plaintiff approached Mr. Tiwary and inquired for the Sales Associate position.  The Plaintiff was not promoted.

52.    The Plaintiff approached a Sales Associate, Mr. Pierce Shortell.[6] The Plaintiff requested from Mr. Shortell to speak on his behalf for the vacant Sales Associate position. Mr. Shortell's answer was "we are looking for a female" at the presence of another Sales Associate.

53.    On or about September 28, 2009, the Plaintiff approached Mr. Tiwary again and inquired for the vacant position. Mr. Tiwary replied he would get back to the Plaintiff after talking to Mr. Andrew Turrin, the District Manager. The Plaintiff did hear from Mr. Tiwary. The Plaintiff was not promoted.

### K. MR. TIWARY UNWELCOMED REMARKS ABOUT MUSLIM PRAYERS

54.    On or about October 1, 2009, Mr. Tiwary attacked the main core of the Plaintiff's faith. Mr. Tiwary made unwelcomed statements by comparing Muslim's worships as a gymnastics exercise. Furthermore, he went into details of each movement of praying; kneeling, bending, standing, sitting, prostrating and turning the Plaintiff's head to the right and then left were good exercises for the muscles and each part of the body. The Plaintiff informed Mr. Tiwary, politely, his remarks could be offensive to one Billion Muslims. Mr. Tiwary's comments were disrespectful and his derogatory statements created a hostile and abusive working environment.

55.    Mr. Tiwary abused and harassed the Plaintiff more than six occasions when he made the Plaintiff work Fridays

56.    On October 4, 2009, the Plaintiff learned coincidently he was scheduled to work on Friday, October 16, 2009, from 10:00am – 2:00pm. Consequently, it would force the Plaintiff to violate his own religious practices. Though, the previous schedule he was not scheduled to work on a Friday, October 16, 2009. Therefore, The Plaintiff inquired with Mr. Tiwary about the schedule and let him know he couldn't work Fridays. He said to the Plaintiff that he had to deal with it because the Plaintiff is in Americas so he has to loosen up and break the rules. The Plaintiff reminded Mr. Tiwary's word to have Friday off and, in addition, the schedule has been changed. Mr. Tiwary replied that it was just one day and no harm will be done and he was sure that the Plaintiff would be forgiven.[7]

57.    Furthermore, Mr. Tiwary said to the Plaintiff that he didn't have to be strict about Friday and if they were on the same page? Additionally, Mr. Tiwary said that he hoped the Plaintiff understood that was the way things work over there.

---

[6] Mr. Shortell was Mr. Tiwary's best friend who had influential on Mr. Tiwary's decisions.
[7] Mr. Tiwary referred that God would not harm me and would forgive me for violating my own religious practices.

8

58. Again, the Plaintiff reminded him about Fridays' discussion during the job interview. Mr. Tiwary replied that the economy was bad and more applicants were looking for jobs.

## L. AUTOMOIBLE ACCIDENT & MY DISABILITY

59. On October 4, 2009, Sunday evening, the Plaintiff got into a car accident. He had suffered from severe pain in his neck, shoulder, back, lower back, left arm and left foot.

60. On October 5, 2009, Monday morning at 1:30am, the Plaintiff called Mr. Tiwary, from Brigham & Women's Hospital Emergency Department, and informed him about the auto accident. The Plaintiff said to Mr. Tiwary that he would have to remain out of work until October 7, 2009. The Plaintiff provided Mr. Tiwary the hospital's out of work letter.

61. On October 6, 2009, the Plaintiff was suffering from incredible pain and met his doctor. The doctor scheduled him for treatment and he would have to remain out of work until October 28, 2009. The Plaintiff informed Mr. Tiwary about his disability condition and provided him the doctor's disability letter. Mr. Tiwary requested the Plaintiff to have his doctor to call him.

62. The Plaintiff's doctor called Mr. Tiwary about the Plaintiff's physical disability situation and his inability to work.

63. On October 28, 2009, the Plaintiff informed Mr. Tiwary that he would be back to work on November 23, 2009, because he was still suffering from pain. The Plaintiff provided Mr. Tiwary his doctor disability letter.

64. On November 20, 2009, the Plaintiff informed Mr. Tiwary that he would be back to work on December 17, 2009, because he was still suffering from pain. The Plaintiff provided Mr. Tiwary his doctor disability letter.

65. On December 16, 2009, the Plaintiff informed Mr. Tiwary that he would be back to work on January 17, 2010, because he was still suffering from pain. The Plaintiff provided Mr. Tiwary his doctor disability letter.

66. On December 18, 2009, the Plaintiff received a letter from Tourneau, Inc. stating that they had previously advised him that they could not hold his position open for him. The letter also stated when the Plaintiff was medically able he could apply for a position.

67. On December 31, 2009, the Plaintiff contacted Tourneau, Inc., about the letter he received because Tourneau, Inc., had not previously advised him that they could not keep his position open for him.

68.    On January 8, 2010, the Plaintiff received a letter form the defendant alleging that they informed him that they could not keep his position open for him on October 7, 2009.

69.    On January 16, 2010, the Plaintiff wrote a letter to the defendant stating that he was medically able and available to work beginning on January 17, 2010.  The Plaintiff also sent the defendant a copy of his disability note and a wage and salary verification form.  The Plaintiff was not re-hired by the defendant.

70.  In or about 2010, Mr. Tiwary hired Ms. Brandy Young who is much younger than the Plaintiff.

71.  In or about 2011, Mr. Tiwary hired Mr. Nathan Hall who is much younger than the Plaintiff.

## M. MEDICAL LEAVE – THE FAMILY & MEDICAL LEAVE ACT

72.    Tourneau was aware of the plaintiff medical situation.  The plaintiff was eligible for the Family & Medical Leave Act ("FMLA").

73.    Tourneau failed to provide the Plaintiff with the short term disability benefits.

## N. VIOLATION OF MEAL BREAK

74.    On March 3, 2009, the Plaintiff worked alone a full double shift from 8:43am – 9:30pm of 12 hours and 45 minutes.  The defendant deducted one hour meal break, thought the Plaintiff did not leave the Cash Office or the store for meal break.

75.    On May 6, 2009, the Plaintiff worked alone a full double shift from 9:33am – 8:46pm of 11 hours and 15 minutes.  The defendant deducted one hour meal break, thought the Plaintiff did not leave the Cash Office or the store for meal break.

76.    On May 7, 2009, the Plaintiff worked alone a full double shift from 9:36am – 8:29pm of 11 hours. The defendant deducted one hour meal break, thought the Plaintiff did not leave the Cash Office or the store for meal break.

## O. SEXUAL HARRASSMENT

77.    Mr. Steven Talluto worked for Alpha Omega when Mr. Tiwary and the Plaintiff were working for the same establishment.

78.    At Alpha Omega, Mr. Talluto made unwelcomed, explicitly verbal and physical conducts of sexual in nature. These conducts created a hostile and offensive work environment.

79.    In May 2009, Mr. Tiwary interviewed Mr. Talluto.  Later, the Plaintiff approached Mr. Tiwary and reminded him of Mr. Talluto's inappropriate misconducts towards him in the past at Alpha Omega.

10

80.    On or about June 7, 2009, Mr. Talluto was hired.

81.    On July 30, 2009, Mr. Talluto made a sexual comment in nature and said "hey, Louay drop your pants." Mr. Talluto's comment was humiliating, offensive, unwelcomed and created uncomfortable work environment. The Plaintiff made Mr. Tiwary aware of his concerns regarding Mr. Talluto's inappropriate misconduct.

82.    On September 10, 2009, Mr. Talluto sexually harassed the plaintiff. He approached the Plaintiff and got so close to the Plaintiff's face and attempted to kiss him. The Plaintiff hold Mr. Talluto back, pushed him away and told him to stop.

83.    The Plaintiff made Mr. Tiwary aware of this incident. The Plaintiff also informed Mr. Tiwary that he would notify Tourneau to end Mr. Talluto's sexual conducts if Mr. Tiwary did not take an action.

84.    Mr. Tiwary ignored the Plaintiff's concerns.

## P. DISCRIMINOTRY REMARKS AND DEFAMATORY COMMENT

85.    On March 18, Ms. Jodi Bienstock made discriminatory remarks against the Plaintiff who said, "Don't chop head, don't chop my head not in this country." The Plaintiff was stunned of such stereo type and discriminatory remarks against an individual who has Middle Eastern origin.

86.    On September 2009, Ms. Casillas was interested about my culture and requested a book to read. So, the Plaintiff gave a book to read entitled "Stories of the Prophets" translated by Sheikh Muhammed Mustafa Gemeiah.

87.    Mr. Talluto saw the translator's name and made a comment that name was similar to the terrorist name who was arrested in connection of September 11, 2001. He was referring to Khalid Sheikh Mohammed, mastermind of 9/11. The Plaintiff explained to him that he was mistaken.

88.    Mr. Talluto still had his own suspicions about the name "Sheikh." Few days, later he informed the Plaintiff that he "googled" the name and found out the person was not the terrorist.

89.    Mr. Talluto implied that the Plaintiff was somehow associated with terrorist groups and reading or handing out materials by such group.

90.    The nation is still at war against the terrorists and any person may think such comments are true. Not only Mr. Talluto doubts were untrue, but they also could have resulted in threatening and jeopardizing the Plaintiff's safety.

**Q. DENIED HEALTHCARE COVERAGE AND MEDICAL LEAVE**

91.    On February 1, 2009, the Plaintiff joined Tourneau, Inc. as full-time as Cash Office Associate and enrolled in one of three of Aetna's plans that were offered.

92.    On February 3, the Plaintiff completed new-hire paper work[8]

93.    On February 6, 2006, the store sent his paperwork to the Human Resources in New York. It included my Aetna's Application for medical insurance.

94.    Mr. Tiwary informed the Plaintiff that his medical insurance would start in effect on April 1, 2009.

95.    On March 27, 2009, Tourneau, Inc., Ms. Jacqueline Alonzo a, Human Resources/Benefits, and Mr. Stuart Fisher, Senior Vice President & General Counsel, sent a Memorandum to the Plaintiff's store in regard to the new medical insurance. Tourneau, Inc., changed healthcare option from three options down to one single plan option; called "Open Access Managed Choice Basic" or Basic Plan.

96.    On April 17, 2009, Monday afternoon, the Plaintiff selected again the single plan option and submitted his application with confirmation. The single plan the Plaintiff selected would not make a difference because it was the same plan he selected on February 2009.

97.    On June 2009, the Plaintiff inquired with Mr. Tiwary the status of his health insurance. Mr. Tiwary replied that he would find out.

98. On July 2009, the Plaintiff approached Mr. Tiwary again and inquired about the status of his health insurance. Mr. Tiwary replied that he forgot about it and would take care of it and assured the Plaintiff not worry.

99. On August 2009, the Plaintiff inquired again the status of his health insurance. Mr. Tiwary appeared not interested.

100. On August 12, 2009, Ms. Alonzo, claimed in her email to Mr. Tiwary that she did not have the Plaintiff's application.

101. On August 17, 2009, the Plaintiff informed Ms. Alonzo that he submitted his medical insurance application twice; one was on February 3, 2009, and the other was on April 17, 2009. She informed the Plaintiff that found his application and assured him she would take care of it.

102. In late September 2009, the Plaintiff informed Mr. Tiwary that he was waiting for his medical insurance. The Plaintiff also informed Ms. Alonzo that he had been waiting for a while to have his healthcare coverage. The Plaintiff did not know why six months had passed and still no medical insurance.

---

[8] New hire document is included the following: Medical & Dental Insurance, life Insurance, Long term Disability

**R. REQUESTING PERSONAL RECORS REVELED ANOTHER ISSUE**

103.  On January 7, 2011, the Plaintiff send a letter to the Defendant Tourneau, Inc. requesting his personal records.  Tourneau declined his request.

104.  On January 31, 2011, the Plaintiff contacted the Attorney General Office to report Tourneau's failure to submit his personnel records.

105.  On February 22, 2011, Tourneau submitted incomplete personnel records.

106.  On March 14, 2011, the Plaintiff contacted the Attorney General Office to inform them Tourneau submitted incomplete records and was still withholding some records.

107.  On March 31, 2011, Tourneau submitted incomplete personnel records.

108.  The Plaintiff was scheduled to work 40 hours per week and should be eligible full benefits package according to Tourneau's Associate Handbook.[9]

109.  The Plaintiff's personal records that was obtained from Tourneau reveled another issue.  On February 6, 2009, the payroll record "Payroll Change Notice" showed the Plaintiff was hired as full-time in the Cash office.  But, on February 17, 2009, the decision was overruled into part-time.

110.  On October 19, 2010, Tourneau confirmed that the plaintiff was hired as a full-time in the Cash office.

111.  If the Plaintiff was hired as full-time employee, he would be entitled to benefits such as sick and vacation hours, unemployment payment, short disability, payments for his medical bills incurred due to the auto accident and extra.

112.  If the Plaintiff was hired as part-time employee, he would be entitled to unemployment payment, payments for his medical bills incurred due to the auto accident and extra.  In addition, the Plaintiff should be entitled from adversely discriminatory action caused by forcing him to work Fridays.

**S. DISPARATE IMPACT**

113.  The Plaintiff alleged that Tourneau's subjective employment practices had an unlawful disparate impact on the Plaintiff's age and racial background in scheduling and promotion.

114.  Mr. Tiwary did not promote the Plaintiff in several occasions and prepared the schedule and tailored around all other associates' needs.

---

[9] Full-time: Associates who works at least 30 hours per week and is eligible for the full benefits package.
Part-time: Associates who works a minimum of 20 hours per week but less than 30 hours and is not eligible for the full benefits package.

13

115.  Tourneau had two full-time student who worked full-time hours got paid benefits such as vacation and sick day hours.  These two students Caucasians females in their early twenties

116.  On April 23, 2009, the Plaintiff called out sick and Tourneau did not pay him sick hours.

117.  The plaintiff found out from Ms. Casillas, his supervisor, that he was hired to fill in when they need extra day off.  Indeed, the other cash office associate used to have consecutive three days off in a row or interrupted with days of work for period time of 28 weeks.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendant, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States and the State of Massachusetts;

B. An order directing Defendant to place Plaintiff in the pay of loss of capacity of earnings for an average yearly income of a Sales Associate position from January 17, 2010 – present that he would have occupied but for Defendant's discriminatory and harassing treatment and otherwise unlawful conduct, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect other minorities;

C. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic harm;

D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment;

E. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory harm, including but not limited to, compensation for his severe anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, emotional distress;

F. An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

G. An award of punitive damages;

H. An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

I. Such other and further relief as the Court may deem just and proper.

14

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Respectfully submitted,

Signature _____

Louay Awadh

PO. Box 230046

Boston, MA. 02123-0046

(617) 419-6952